Filed 2/6/24  In re O.E. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re O.E., a Person Coming Under the Juvenile Court Law. | B329093 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ORLANDO E. et al.,<br><br>Defendants and Appellants. | (Los Angeles County Super. Ct. No. DK23763) |

APPEAL from orders of the Superior Court of Los Angeles County, Jennifer W. Baronoff, Juvenile Court Referee. Conditionally affirmed with directions.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant Kimberly M.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant Orlando E.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Kimberly M. and Orlando E., parents of six-year-old O.E., appeal from the juvenile court's orders terminating their parental rights under Welfare and Institutions Code section 366.26.[1] They argue the court erred in ruling the parental-benefit exception to adoption in section 366.26, subdivision (C)(1)(b)(i), did not apply. They also argue the Los Angeles County Department of Children and Family Services failed to comply with the inquiry requirements of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and related California law. We conditionally affirm the juvenile court's orders terminating Kimberly's and Orlando's parental rights and direct the court to ensure the Department complies with the inquiry and, if necessary, notice provisions of ICWA and related California law.

_____

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

2

# FACTUAL AND PROCEDURAL BACKGROUND

A. *The Juvenile Court Sustains a Petition Under Section 300 and Removes O.E.*

We described much of the factual and procedural background of these proceedings in Kimberly and Orlando's prior appeal from the juvenile court's orders terminating their parental rights. (See *In re O.E.* (Sept. 14, 2022, B314713) [nonpub. opn.] (*O.E. I*).) In August 2017, when O.E. was not quite two months old, the Department detained him from Kimberly and Orlando and filed a petition under section 300, subdivision (b). The Department alleged O.E. was at substantial risk of serious physical harm because of, among other things, his positive toxicology screen for marijuana after his birth, Kimberly's history of substance abuse, and Orlando's history of illicit drug use. The Department also alleged Kimberly's current use of marijuana and Orlando's current use of amphetamine and methamphetamine rendered them incapable of providing regular care and supervision of O.E. (*O.E. I.*)

At the detention hearing the juvenile court ordered O.E. to remain detained and ordered monitored visits and weekly drug testing for Kimberly and Orlando. In a jurisdiction and disposition report the Department indicated that Kimberly and Orlando had each missed two drug tests and that on another occasion Kimberly tested positive for amphetamine, methamphetamine, and cannabinoids. (*O.E. I, supra*, B314713.)

At a combined jurisdiction and disposition hearing the juvenile court sustained all allegations in the petition, found O.E. was a child described by section 300, subdivision (b), declared him a dependent child of the court, and removed him from

Kimberly and Orlando.  The court ordered reunification services for both parents, including a drug and alcohol program and weekly drug testing.  The court also ordered monitored visitation for both parents.  (*O.E. I*, *supra*, B314713.)

B.     *The Juvenile Court Returns O.E. to Kimberly*

For the six-month review hearing, the Department reported that Kimberly and Orlando were visiting O.E. consistently and that the visits were "going well."  At the hearing, the juvenile court found Kimberly and Orlando were in partial compliance with their case plans and ordered family reunification services to continue.  (*O.E. I*, *supra*, B314713.)

For the 12-month review hearing, the Department reported that Kimberly was "progressing well" with her drug treatment program and that the Department was allowing her to have unmonitored and more frequent visits with O.E.  Orlando continued to have monitored visits two days a week.  At the hearing the juvenile court found that Kimberly's compliance with her case plan was "substantial, but not absolutely complete," and that Orlando's was "partial."  (*O.E. I*, *supra*, B314713.)

For the 18-month review hearing, the Department reported that Kimberly was living in a sober living home and had six successful unmonitored overnight weekend visits with O.E.  The Department stated that Kimberly "demonstrate[d] the parenting skills she [had] learned effectively" and that O.E. appeared "to have a healthy attachment" to her.  The Department recommended placing O.E. with Kimberly at the sober living home and providing her family preservation services.  The Department recommended against returning O.E. to Orlando because, though Orlando was visiting O.E. consistently, he had

4

only partially complied with his case plan.  At the hearing the juvenile court returned O.E. to Kimberly and ordered family maintenance services for Kimberly and enhancement services for Orlando.  (*O.E. I*, *supra*, B314713.)

C. *The Department Files a Supplemental Petition Under Section 387, and the Juvenile Court Detains O.E. from Kimberly*

For a section 364 review hearing in October 2019, the Department reported Kimberly had "struggled with her sobriety and relapsed twice," testing positive for methamphetamine in May and June 2019.  Kimberly had moved out of the sober living home and was "disconnected from her recovery supports."  She and O.E. were living with Orlando's father.  Kimberly agreed to participate in family preservation services to avoid having O.E. removed from her again.  The Department reported that Orlando was not in compliance with his case plan and was not cooperating with the Department, but that, according to Kimberly, he visited O.E. weekly.  At the hearing the juvenile court found Kimberly and Orlando were in partial compliance with their case plans and ordered O.E. to remain placed with Kimberly.  (*O.E. I*, *supra*, B314713.)

In July 2020 the Department filed a supplemental petition under section 387, asking the court to remove O.E. from Kimberly.  The Department alleged Kimberly was not capable of providing O.E. with regular care and supervision because, among other things, she was currently abusing marijuana, methamphetamine, and alcohol; was not participating in a drug program with weekly testing, as ordered by the court; and had

5

been arrested for bringing controlled substances into a prison, in violation of Penal Code section 4573. (*O.E. I*, *supra*, B314713.)

The Department reported that law enforcement had executed a search warrant for methamphetamine and related paraphernalia at the home of Orlando's father and had arrested Kimberly for smuggling drugs to Orlando, who was in jail for drug-related offenses. Kimberly's roommate at the home of Orlando's father said Kimberly had "not been honest" about her drug use and knew "how to manipulate the system," for example, by getting high only immediately after her drug tests. The roommate stated that when Kimberly used drugs she would keep O.E. in the room with her all day and not let him out, though O.E. cried and said, "I want out." (*O.E. I*, *supra*, B314713.)

In July 2020 the juvenile court held a detention hearing on the supplemental petition. The court detained O.E. from Kimberly and ordered family reunification services for her and Orlando. (*O.E. I*, *supra*, B314713.)

D.     *The Juvenile Court Sustains the Supplemental Petition and (Again) Removes O.E.*

In a September 2020 jurisdiction and disposition report, the Department indicated O.E. was again living in the home of his previous foster parents, where he appeared happy, comfortable, and affectionate toward his caregivers. Kimberly and Orlando remained incarcerated. The Department reported that, in searching the home of Orlando's father, law enforcement found methamphetamine, scales, and baggies, which resulted in Kimberly's arrest. A Los Angeles County Sheriff's Department report reflected that Kimberly admitted smuggling methamphetamine into a jail facility for Orlando. Kimberly was

6

released shortly after her June 2020 arrest, but she was arrested again in July 2020, this time for violating probation conditions related to a previous offense. She was now serving a three-year sentence, with a scheduled release date of (as the Department later reported) October 2021. Orlando was scheduled for release on March 6, 2021. (*O.E. I*, *supra*, B314713.)

In March 2021 the juvenile court held a jurisdiction hearing on the supplemental petition and sustained all the allegations. The court continued the disposition hearing for the Department to file a last minute information report regarding Kimberly's and Orlando's progress in their programs. The Department did so, reporting that Kimberly was participating in several programs where she was incarcerated. The Department also reported that, after Orlando was released from incarceration on March 6, 2021, the Department monitored a visit between him and O.E., during which both appeared "very happy." Three days after the visit, Orlando tested positive for amphetamine and methamphetamine. (*O.E. I*, *supra*, B314713.)

At the disposition hearing, held later in March 2021, the juvenile court removed O.E. from Kimberly, declined under section 361.5, subdivision (a)(3)(A), to order family reunification services for her or Orlando, and ordered monitored visitation for both parents. The court set the matter for a selection and implementation hearing under section 366.26. (*O.E. I*, *supra*, B314713.)

### E. *The Juvenile Court Terminates Kimberly's and Orlando's Parental Rights, and We Reverse*

In a July 2021 report for the section 366.26 hearing, the Department indicated O.E. was having weekly monitored visits

7

with Orlando and weekly monitored telephone visits with Kimberly. The Department reported that Orlando's visits with O.E. were "appropriate and productive" and that O.E. appeared "happy and comfortable around" Orlando. In the one telephone visit between Kimberly and O.E. that the Department described, O.E. appeared reluctant to talk with his mother. When his caregivers prompted him to speak with her on the telephone, he said, "I don't want to. Do I have to?" When told he did, O.E. and Kimberly had a short conversation where Kimberly "inquired as to his wellbeing." O.E. answered her questions with "yes" or "no" and did not appear "engaged" in the conversation. The Department recommended the court terminate Kimberly's and Orlando's parental rights. (*O.E. I*, *supra*, B314713.)

Orlando, for his part, filed a section 388 petition, asking the court to return O.E. to his care, reinstate Orlando's family reunification services, or have his visits with O.E. liberalized. Stating he had completed parenting classes and a 12-step recovery program, Orlando argued O.E. had "developed a close bond with" him and loved to spend time with him. In a declaration, Orlando described his progress in parenting and substance abuse programs and his current weekly visits with O.E.: "Our weekly monitored visits are great and productive. The social worke[r] has observed that my son and I have a strong bond and that we enjoy spending time together. My son demonstrates how much he wants me in his life, as well as how much he looks up to me." Orlando also requested a bonding study for him and O.E., which the juvenile court denied. (*O.E. I*, *supra*, B314713.)

On August 31, 2021 the juvenile court held an evidentiary hearing on Orlando's section 388 petition and the hearing under

8

section 366.26. The court began by addressing the section 388 petition, admitting into evidence, among other items, Orlando's petition and attachments. Orlando testified about his progress in his parenting and substance abuse programs and his recent weekly visits with O.E. He testified that at the start of these visits O.E. would smile and run to him, give him a hug, and remain by him, not letting Orlando out of his sight. During the visits O.E. also invited Orlando to his house and wanted to show Orlando "things in his room." Orlando said O.E. looked up to him "as a strong male role model." The court denied Orlando's petition. (*O.E. I*, *supra*, B314713.)

Turning to the section 366.26 hearing, the juvenile court heard testimony from Kimberly, who stated she was scheduled for release on September 12, 2021. She said that, before she was incarcerated, O.E. lived with her for "about a year and a half." She also testified that, while incarcerated, she visited with O.E. twice each week by telephone and that, during these visits, O.E. would tell her that he loved her and missed her. Counsel for Kimberly and counsel for Orlando argued the court should not terminate their clients' parental rights because the parental-benefit exception under section 366.26, subdivision (c)(1)(B)(i) applied. (*O.E. I*, *supra*, B314713.)

The juvenile court terminated Kimberly's and Orlando's parental rights, finding no exception to adoption applied. The court found: "The court notes that mother's and father's visitation has been seemingly appropriate and pleasant. No issues with the visitation. But the court also finds that, as to father, he has not served a parental role in this minor's life. . . . Since the minor was two months old, when this case started, the father has not been, really, a father to the minor. But the court

9

does note that recently father's visits have been appropriate.  But the court cannot find that the father's bond with the child is more than just an emotional bond.  The court cannot find that he serves [a] parental role in this child's life." (*O.E. I*, *supra*, B314713.)

The juvenile court continued:  "As to mother, the court is very concerned with what happened when the child was in the mother's care.  Mother had an opportunity, a very great opportunity, to keep the child in her care when child was returned to her.  But she squandered that when she diced by bringing narcotics to the father while in custody while the child was in her care.  I think that decision is revealing as to how committed she is to the child's welfare."[2] (*O.E. I*, *supra*, B314713.)

The juvenile court concluded:  "The court cannot find that terminating parental rights would be detrimental to the child, when the child is in a safe home with caregivers that love him and want to give him stability.  And the court cannot find that the child would be greatly harmed by terminating parental rights. . . .  [The] court finds that any benefit to the child from the relationship with mother and father is outweighed by the physical and emotional benefit of adoption and stability and permanency of the adoption and that adoption is in the best interests of the child." (*O.E. I*, *supra*, B314713.)

Kimberly and Orlando appealed from the juvenile court's order terminating their parental rights.  We reversed, concluding that the juvenile court failed to consider whether O.E. would benefit from continuing his relationship with Kimberly and

---

[2]     The juvenile court appeared to use the word "diced" to mean "gambled" or "gambled away."

Orlando, as required by *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), and that neither the Department nor the juvenile court complied with ICWA's inquiry requirements. (*O.E. I, supra*, B314713.)

F. *On Remand the Juvenile Court Again Terminates Kimberly's and Orlando's Parental Rights*

In September 2022 the juvenile court reinstated Kimberly's and Orlando's parental rights and ordered monitored visitation. The court also ordered a bonding study for both parents. Regarding ICWA, the court ordered the Department to "investigate American Indian heritage with both sides of the family" and to report on "who [the Department] interviewed and who was available." The court set the matter for a selection and implementation hearing under section 366.26.

In a December 2022 report for the section 366.26 hearing, the Department stated that in October 2022 O.E. had resumed weekly monitored visits with Kimberly and Orlando for the first time in three months. The visit was "appropriate and productive," O.E. appeared "content and comfortable," and Kimberly, Orlando, and O.E. were "engaged" as they played together.

In November and December 2022, however, O.E.'s caregiver cancelled two visits because O.E. "refused to attend" and "threw a big tantrum." When O.E. arrived for the next weekly visit, he told the social worker he did not want to see his parents. When the social worker asked why, O.E. said he wanted to visit Orlando but not Kimberly because, when O.E. lived with Kimberly, she would not let him out of the room. Nonetheless, O.E. visited with Kimberly and Orlando that day, and the

11

Department reported that O.E. "appeared very comfortable being in close proximity with his parents," that Kimberly, Orlando, and O.E. "had lots of laughs together," and that O.E. "enjoyed the visit as much as the parents." The following week, Kimberly and Orlando greeted O.E. with hugs, which O.E. "reciprocate[d]," and "the family remained engaged during the visit time and displayed laughs and joy."

In a March 2023 report the Department described the family visits as "positive and productive." At the start of one visit, O.E. "appeared to be happy and came in on his own to see his parents." The Department described a January 2023 visit as "full of positive energy and much fun" and stated the "parents' efforts are successful to entertain the child and create fun memories." The Department similarly described other visits as "very positive" and stated the "bonding of the family is observed to grow stronger with each visit."

In April 2023 the Department reported that, when asked where his home was, O.E. said his caregivers' home was his home and that O.E. nodded "yes" when asked whether he wanted to stay in the caregivers' home. The Department submitted the court-ordered bonding study performed by Dr. Alfredo Crespo. Dr. Crespo reported that O.E. was "understandably primarily attached to [his] caregivers," that O.E. "did not appear particularly attached to" Orlando or Kimberly, and that, in Dr. Crespo's opinion, O.E.'s "best interests are better served" by adoption rather than legal guardianship.

On April 28, 2023 the juvenile court held a hearing under section 366.26. The court received into evidence the Department's reports. Counsel for Kimberly objected to portions of the bonding study containing psychological evaluations of

Kimberly and Orlando and one paragraph in the "Summary of Evaluations, Opinions and Recommendations" section discussing Kimberly's and Orlando's "highly troubled personal histories." The court sustained the objections, excluded those portions, and admitted the remainder of the study.

The court heard testimony from Kimberly, who stated she had been visiting with O.E. weekly during the previous year. She testified that during recent visits they had gone to a trampoline park, seen a movie, played games, and worked on O.E.'s writing and counting. Kimberly said that when they play, O.E. is "engaged" and "enjoying himself." Regarding the bonding study, Kimberly stated Dr. Crespo observed her and Orlando with O.E. for about 10 minutes. Kimberly testified that the "whole visit was choreographed" and that Dr. Crespo told Kimberly and Orlando "exactly how to visit with [O.E.] and what to say and how to say it. And it was basically very awkward." Kimberly said Dr. Crespo directed her to ask O.E. what O.E. had discussed with Dr. Crespo before Kimberly and Orlando entered the room and that O.E. said "I don't know" and "I don't remember."

Counsel for Kimberly and counsel for Orlando argued the parental-benefit exception under section 366.26, subdivision (c)(1)(B)(i), applied. Counsel for Orlando argued that, according to the Department's reports, O.E. was "well attached or bonded to his parents and has positive interactions and emotions towards them." Counsel asked the court to give "little weight" to the bonding study because Dr. Crespo observed O.E. with his parents for only 10 minutes and Dr. Crespo's conclusions contradicted what Department social workers observed during Kimberly and Orlando's visits with O.E.

13

The juvenile court again terminated Kimberly's and Orlando's parental rights, finding they had not proved the parental-benefit exception applied. The court found: "Without a doubt, it is in [O.E.'s] best interest to remain with his [caregivers] who have raised him and for him to be adopted by them." Applying the three-part test under *Caden C.*, *supra*, 11 Cal.5th 614, the court found Kimberly and Orlando had satisfied the first element by regularly visiting with O.E. The court then turned to the second element—"a relationship, the continuation of which would benefit the child, meaning a substantial positive emotional attachment." The court stated that, although O.E. said in December 2022 he did not want to visit with Kimberly, "things have gotten better with regard to the visits," and "it seems like there's a lot of fun that [O.E.] has on the visits. He's happy at the visits. But I don't know that I can say that there is enough for a beneficial relationship." The court also stated that O.E. was almost six years old and that, "with the exception of about a year, he has been in the care of his prospective adoptive parents" for his entire life.

Addressing the third element, the court stated: "Assuming a beneficial relationship exists, then I need to look at the benefits of adoption. . . . And I can't see that severing the relationship that he has with his parents would be so detrimental to him that, you know, spending these times at play areas and reading and having fun with people who love him but are essentially playmates, that severing that would be so detrimental that it would outweigh the security and permanency that adoption would offer him." The court also cited Dr. Crespo's conclusion adoption was in O.E.'s best interests.

Concerning ICWA, the juvenile court found that the Department had interviewed additional relatives, that there was no one else the Department needed to interview, and that the court had "no reason to know or believe that the Indian Child Welfare Act applies." Kimberly and Orlando timely appealed from the orders terminating their parental rights.

## DISCUSSION

A. *The Juvenile Court Did Not Err in Ruling the Parental-benefit Exception Did Not Apply*

1. *Applicable Law and Standard of Review*

The purpose of a section 366.26 hearing is "'to select and implement a permanent plan for the child'" after reunification services have been terminated. (*Caden C.*, *supra*, 11 Cal.5th at p. 630; see *In re D.M.* (2021) 71 Cal.App.5th 261, 268.) If the court determines "the child is likely to be adopted," the court must "terminate parental rights to allow for adoption." (*Caden C.*, at p. 630; see § 366.26, subd. (c)(1); *In re I.E.* (2023) 91 Cal.App.5th 683, 690.) "But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, at pp. 630-631; see § 366.26, subd. (c)(1)(B)(i)-(vi), (4)(A); *In re M.G.* (2022) 80 Cal.App.5th 836, 846.) One of those reasons, the parental-benefit exception, requires the parent to establish by a preponderance of the evidence (1) "the parent has regularly visited with the child," (2) "the child would benefit from continuing the relationship," and (3) "terminating the

15

relationship would be detrimental to the child." (*Caden C.,* at p. 629; see § 366.26, subd. (c)(1)(B)(i); *D.M.,* at p. 268.)

"The first element—regular visitation and contact—is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra,* 11 Cal.5th at p. 632; see *In re A.L.* (2022) 73 Cal.App.5th 1131, 1151.)

To establish the second element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra,* 11 Cal.5th at p. 636; see *In re J.D.* (2021) 70 Cal.App.5th 833, 852.)  The "focus is the child," and "the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.,* at p. 632; see *J.D.,* at p. 854.)  In assessing the attachment, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.,* at p. 632; see *J.D.,* at p. 854.)  Bonding studies by "expert psychologists who have observed the child and parent and can synthesize others' observations" often will be "an important source of information about the psychological importance of the relationship for the child." (*Caden C.,* at pp. 632-633; see *In re Katherine J.* (2022) 75 Cal.App.5th 303, 317.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption.  [Citations.]  Because

16

terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.]  What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633; see *In re I.E.*, *supra*, 91 Cal.App.5th at p. 692; *In re A.L.*, *supra*, 73 Cal.App.5th at p. 1151.)

We review the juvenile court's findings on the first two elements for substantial evidence.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640; *In re Katherine J.*, *supra*, 75 Cal.App.5th at p. 317.)  "The third element—whether termination of parental rights would be detrimental to the child—is somewhat different.  As in assessing visitation and the relationship between parent and child, the court must make a series of factual determinations. . . .  [¶]  Yet the court must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain. . . .  The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home.  And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, at p. 640; see *In re I.E.*, *supra*, 91 Cal.App.5th at p. 691.)

17

### 2. *The Juvenile Court Did Not Err in Terminating Kimberly's and Orlando's Parental Rights*

The juvenile court found, and the Department does not dispute, Kimberly and Orlando carried their burden on the first element of the parental-benefit exception—regular visitation. Kimberly and Orlando argue the juvenile court erred in finding they did not prove the second and third elements: that O.E. would benefit from continuing the parental relationship and that terminating the relationship would be detrimental to O.E.

As discussed, although on a few occasions O.E. said he did not want to visit with Kimberly, the evidence showed O.E. generally enjoyed his visits with Kimberly and Orlando. Kimberly and Orlando brought O.E. toys and games; O.E. appeared comfortable, happy, and engaged; and the three of them laughed and had fun. According to the Department, the bonds between O.E. and his parents grew stronger with each visit. But as the juvenile court stated in analyzing whether Kimberly and Orlando had met their burden on the second element of the parental-benefit exception, "there's always going to be some incidental benefit, and frequent and loving contact is not enough." (See *In re G.H.* (2022) 84 Cal.App.5th 15, 25 ["Friendly or affectionate visits are not enough."]; *In re Katherine J.*, *supra*, 75 Cal.App.5th at p. 318 ["the beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent"]; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [parental-benefit exception "applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent"].)

And however positive O.E.'s relationship with Kimberly and Orlando was, there was little evidence that terminating that relationship would be detrimental to O.E. Although O.E. enjoyed the visits, there was no evidence he looked forward to them or was sad when they ended. As even the testimony of Kimberly and Orlando reflected, O.E. was primarily interested in seeing what toys Kimberly and Orlando brought, and neither Kimberly nor Orlando said O.E. was sad when visits ended. Although Orlando testified that at the beginning of visits O.E. would smile, run to Orlando, and give him a hug, Kimberly testified O.E. "barrels right through and wants to start doing whatever we have, wants to see what's in the bag." Kimberly also testified that, rather than offering hugs at the start of visits, O.E. would hug her and Orlando when they "ask[ed] him for a hug" and that O.E. hugged them because he was "prompted." And although, according to Orlando, O.E. invited him to his house and said he wanted to show Orlando items in O.E.'s room, O.E. did not appear sad at the end of visits and never said he wanted to spend more time with Orlando. In sum, while the evidence indicated O.E. enjoyed the visits, it did not show that ending them would be harmful to O.E. (See *In re I.E.*, *supra*, 91 Cal.App.5th at p. 692 [evidence the child "experienced no distress at the end of visits" supported the juvenile court's finding "the relationship was not so substantial that its severance would be detrimental to the child"]; *In re A.L.*, *supra*, 73 Cal.App.5th at pp. 1158-1159 [though the child viewed the father as "'a fun, friendly person' to have visits with," the child "had no difficulty separating from father at the end of visits" and "was easily redirected when father had missed scheduled video visits"]; cf. *In re D.M.*, *supra*, 71 Cal.App.5th at p. 271 [children had lived with father for two to

eight years, wanted to return to him, and cried when visits concluded]; *In re J.D., supra,* 70 Cal.App.5th at pp. 857-858 [child frequently expressed a desire to go to his mother's house, told her he loved her, and sought her attention during visits]; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1229, fn. 4 [children looked forward to seeing their parents, greeted them with hugs, and expressed sadness at the end of visits].)

In contrast, the evidence O.E. would benefit from adoption by his foster parents was significant. O.E. was placed with his foster parents when he was seven weeks old and, at the time of the hearing, had lived with them for approximately five of his nearly six years. According to the Department, O.E. was "bonded to [his caregivers] and identifies them as his parents." O.E. called one of his caregivers "mom." O.E. described his caregivers' home as his home and nodded "yes" when asked whether he wanted to stay there. (See *In re A.L., supra,* 73 Cal.App.5th at p. 1158 [child "told social workers that she was very happy living with the caregivers," called them ""mommy," "mom," "dad," and "daddy,"" and said "she loved them"].) The juvenile court did not err in ruling the benefits of adoption outweighed any harm from ending O.E.'s relationship with his parents.

### 3. *The Juvenile Court Did Not Prejudicially Err in Relying on the Bonding Study*

Kimberly and Orlando argue that Dr. Crespo's bonding study was flawed and that the juvenile court "relied almost exclusively" on the study in finding that severing O.E.'s relationship with his parents would not be detrimental. While there were some problems with the bonding study, any error by the court in relying on it was harmless.

First, Kimberly and Orlando contend "Dr. Crespo's conclusions and recommendations . . . were premised on his observation that [O.E.] was 'highly integrated' into the caregivers' blended family, and the 'imminent removal' of the minor from their home would cause him 'significant emotional distress.'" They argue it was inappropriate for Dr. Crespo to consider how O.E. would react to removal from his caregivers because that was not a possibility, even if the court found the parental-benefit exception applied. (See *Caden C.*, *supra*, 11 Cal.5th at p. 634 ["Nothing that happens at the section 366.26 hearing allows the child to return to live with the parent."]; *In re J.D.*, *supra*, 70 Cal.App.5th at p. 860 [same].)

While the court did refer to Dr. Crespo's conclusion "imminent removal from [the caregivers'] home would likely cause [O.E.] significant emotional distress" (an inappropriate consideration under *Caden C.*), the court did not appear to base its decision on that conclusion. Indeed, before the juvenile court mentioned Dr. Crespo's report, the court stated that O.E. had "spent almost his entire life with his prospective adoptive moms," that Kimberly and Orlando were "essentially playmates" for O.E., and that any harm from severing O.E.'s relationship with Kimberly and Orlando was outweighed by "the security and permanency that adoption would offer him." These were appropriate factors for the court to consider in determining whether O.E.'s relationship with his parents was "so important to the child that the security and stability of a new home wouldn't outweigh its loss." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

It was only after making these findings that the court discussed Dr. Crespo's report. Although the court mentioned Dr. Crespo's (irrelevant) conclusion O.E. would suffer emotional

21

distress if removed from his caregivers, the court also referred to several relevant conclusions by Dr. Crespo, including that O.E.'s contact with Kimberly was "emotionally taxing." Dr. Crespo appeared to base that conclusion on a report from O.E.'s caregiver that her "main concern" about O.E. was his behavior before and after seeing Kimberly and that O.E. was "fearful vis-à-vis his 'visits with [Kimberly and Orlando].'" How O.E. felt about visiting his parents was an appropriate consideration for the court. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632 [in deciding whether a child would benefit from continuing the relationship, the juvenile court should consider "'the "positive" or "negative" effect of interaction between parent and child'"]; *In re M.V.* (2023) 87 Cal.App.5th 1155, 1185 (*M.V.*) [same].)

The court also stated that, according to Dr. Crespo, O.E. "did not appear particularly attached" to Kimberly or Orlando and that he "resisted their displays of affection, in contrast to his acceptance of similar displays of affection initiated by one of his prospective adoptive moms." While Kimberly and Orlando did not have to prove O.E. was primarily bonded to them rather than to his caregivers (see *In re J.D.*, *supra*, 70 Cal.App.5th at p. 859), they did have to show O.E. had a substantial, emotional bond with them, and one way of assessing that bond was by observing how O.E. responded to his parents' displays of affection. That was also an appropriate matter for Dr. Crespo to observe and for the juvenile court to consider. (See *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 204 ["at the beginning of visits, the children were happy; they would run to [their mother] and hug her"]; see also *In re M.G.*, *supra*, 80 Cal.App.5th at p. 850 [bonding study's failure to "informatively analyz[e] the parent-child interactions" was "a fatal lack of information"].)

Second, Kimberly and Orlando contend "the bonding study was really a psychological evaluation of the parents." It is true that 13 pages of Dr. Crespo's 23-page report consisted of psychological evaluations of Kimberly and Orlando, including psychological test results and descriptions of their appearances, substance abuse, and past relationships, which were beyond the scope of Dr. Crespo's assignment. But the juvenile court sustained an objection by counsel for Kimberly to that part of the report and stated it would "not be considering those portions of the bonding study." Kimberly and Orlando do not argue the court relied on any portion of the study not in evidence.

Kimberly and Orlando also argue that, to the extent the bonding study assessed O.E.'s bond with them, the study was unreliable because Dr. Crespo observed Orlando, Kimberly, and O.E. together for only 10 minutes and spent some of that time directing Kimberly and Orlando to ask O.E. questions about the child's earlier conversation with Dr. Crespo. Had the court relied exclusively on this 10-minute interaction as evidence of O.E.'s relationship with his parents, Kimberly and Orlando might have a point. But there was considerable additional evidence of O.E.'s relationship with Kimberly and Orlando, including the Department's reports of monitored visits for the two-year period from March 2021 to March 2023. And the court reviewed those reports.

Kimberly and Orlando cite *M.V.*, *supra*, 87 Cal.App.5th 1155, where the court held the juvenile court erred in relying on an "inadequate, nonresponsive assessment" performed by Dr. Crespo. (*Id*. at p. 1182.) In *M.V.* the Department alleged the parents sexually exploited their child. (*Id*. at p. 1162.) The court described the "extremely troubling, high-conflict proceedings,"

where "the adults in [the child's] life gave difficult-to-reconcile accounts of her behavior, attachments, and relationships," as "exactly the kind of case in which a bonding study is valuable." (*Id*. at p. 1180.)  Dr. Crespo, participating by video call rather than in person, observed the six-year-old child interacting with each parent for only a few minutes, and rather than watching the child interact with her parents, he spent the time questioning them.  (*Id*. at pp. 1172, 1180.)  Although the record showed the child "repeatedly expressed a desire to live with [her parents] and to continue her relationship with them," was "upset and sometimes cried when she was unable to visit with them in person," and "experienced distress when separating from her parents and questioned why they could not live together" (*id*. at pp. 1179-1180), the juvenile court in *M.V.* terminated parental rights, stating it "'gave much weight to Dr. Crespo's analysis'" (*id*. at p. 1173).  The juvenile court also denied the parents' request for a supplemental report addressing the impact on the child of severing the relationship.  (*Id*. at p. 1168.)  The court in *M.V.* held that, "under the very specific circumstances of this case, we conclude it was an abuse of discretion not to order a supplemental bonding study in response to Crespo's inadequate, nonresponsive assessment."  (*Id*. at p. 1182.)

Although Dr. Crespo's bonding study in this case shared some of the same deficiencies as his study in *M.V.*,[3] other aspects of the bonding study here were more relevant and reliable. Dr. Crespo observed Kimberly, Orlando, and O.E. in person, not

---

[3]     As in this case, the "majority of Crespo's report concerned his observations and psychological evaluations of the parents," and he "offered unsolicited opinions about the best permanent plan."  (*M.V.*, *supra*, 87 Cal.App.5th at pp. 1177, 1181.)

on a video call, and, at least briefly, watched them interact naturally, playing "hangman" and "tic-tac-toe," which, Dr. Crespo reported, "O.E. enjoyed as suggested by frequent, joyous, laughter." In addition, while the juvenile court in *M.V.* "'gave much weight to Dr. Crespo's analysis'" (*M.V.*, *supra*, 87 Cal.App.5th at p. 1185), the juvenile court here relied primarily on evidence of O.E.'s relationship with his parents from sources other than the bonding study, including the length of time O.E. had spent with his caregivers and the Department's descriptions of O.E.'s visits with his parents over several years. Finally, the record in this case does not contain evidence, as there was in *M.V.*, the child wanted to continue his relationship with his parents.

Kimberly and Orlando's reliance on *In re M.G.*, *supra*, 80 Cal.App.5th 836 is also misplaced. In that case the juvenile court ordered a bonding study to assess the relationship between a non-verbal three-year-old and his developmentally disabled parents. (*Id.* at p. 850.) Rather than analyze parent-child interactions, the bonding study focused on the child's numerous developmental, psychological, and medical needs. (*Ibid.*) The court in *In re M.G.* held the study did "not provide substantial evidence to support a ruling that no emotional bond exists." (*Id.* at p. 851.)

B. *Remand Is Required for the Department and the Juvenile Court To Comply with ICWA*

"ICWA and governing federal regulations (25 C.F.R. § 23.101 et seq.) set minimal procedural protections for state courts to follow before removing Indian children and placing them in foster care or adoptive homes" (*In re Rylei S.* (2022)

25

81 Cal.App.5th 309, 316), including "'ask[ing] each participant "at the commencement" of a child custody proceeding "whether the participant knows or has reason to know that the child is an Indian child""'" (*In re Robert F.* (2023) 90 Cal.App.5th 492, 500, review granted July 26, 2023, S279743; see 25 C.F.R. § 23.107(a); *In re J.C.* (2022) 77 Cal.App.5th 70, 77). California law "'more broadly imposes on social services agencies and juvenile courts (but not parents) an "affirmative and continuing duty to inquire" whether a child in the dependency proceeding "is or may be an Indian child.""'" (*J.C.*, at p. 77; see § 224.2, subd. (a); *In re A.R.* (2022) 77 Cal.App.5th 197, 237.)

"[S]ection 224.2, subdivision (b), requires the child protective agency to ask 'the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.'" (*In re J.C.*, *supra*, 77 Cal.App.5th at p. 77; see *In re H.V.* (2022) 75 Cal.App.5th 433, 437; Cal. Rules of Court, rule 5.481(a)(1).) Although this duty is "commonly referred to as the 'initial duty of inquiry,' it 'begins with the initial contact' (§ 224.2, subd. (a)) and continues throughout the dependency proceedings." (*J.C.*, at p. 77; see *Haaland v. Brackeen* (2023) 599 U.S. 255, 268, [143 S.Ct. 1609, 1623] [when a state court adjudicates a foster care or adoption proceeding, "ICWA governs from start to finish"]; *In re Rylei S.*, *supra*, 81 Cal.App.5th at p. 319.) In addition, the "'juvenile court "has a responsibility to ascertain that [the child protective agency] has conducted an adequate investigation"'" [citation], and must determine whether ICWA applies to the child's proceedings [citation]." (*In re G.H.*, *supra*, 84 Cal.App.5th

26

at p. 31; see § 224.2, subd. (i)(2); *J.C.*, at p. 78; Cal. Rules of Court, rule 5.481(b)(3).) The court may not "find that ICWA does not apply when the absence of evidence that a child is an Indian child results from a [child protective agency] inquiry that is not proper, adequate, or demonstrative of due diligence." (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 408; see *In re L.S.* (2014) 230 Cal.App.4th 1183, 1198.)

In *O.E. I*, *supra*, B314713 we held the Department had not complied with its duty of inquiry because, although Kimberly and Orlando denied Indian ancestry, the Department failed to ask known and readily available members of O.E.'s extended family about whether O.E is or may be an Indian child, including O.E.'s paternal grandfather, a paternal aunt, and two maternal aunts. At the April 28, 2023 selection and implementation hearing after remand, the juvenile court found that the Department had interviewed O.E.'s parents and extended family members and that ICWA did not apply. Kimberly and Orlando argue the Department's additional inquiry was inadequate because the Department failed to interview a maternal aunt.[4]

Kimberly and Orlando are correct. The Department conducted an adequate investigation on the paternal side of the family by interviewing the paternal grandfather and the paternal aunt, neither of whom believed O.E. had any Indian ancestry. But the only effort the Department made to contact the maternal

---

[4] Although the parties' briefs and our opinion in *In re O.E. I* refer to two maternal aunts, it appears there is only one maternal aunt whom the parties refer to alternately by her full first name and a nickname.

27

aunt was to call and leave a voicemail message. That was not enough.

The Department argues it "substantially complied" with our directions in *O.E. I.* The Department contends ICWA did not require it "to conduct further inquiry" if the maternal aunt was "unreachable or refuses to speak with the social worker." But because the Department did not make a second attempt to reach the maternal aunt when she did not call back, it is unclear whether she was unreachable or refused to speak to the Department. It is equally likely the maternal aunt didn't get the message or simply forgot to call back.

Finally, we cannot say the Department's failure to follow up with the maternal aunt was harmless. Given the Department's failure to interview any maternal family members (other than Kimberly), "the information in the hands of [the maternal aunt was] likely to be meaningful in determining whether [O.E.] was an Indian child." (*In re Antonio R.* (2022) 76 Cal.App.5th 421, 435.)[5]

---

[5] The Department argues Kimberly and Orlando forfeited their challenge to the juvenile court's ICWA findings by not objecting at the section 366.26 hearing. However, "the law allows a parent to raise failure to comply with ICWA on appeal, even if the issue was not raised in the trial court, because '[t]he parent is in effect acting as a surrogate for the tribe in raising compliance issues on appeal.'" (*In re A.R., supra,* 77 Cal.App.5th at p. 204; see *In re K.R.* (2018) 20 Cal.App.5th 701, 706.)

## DISPOSITION

The juvenile court's orders terminating Kimberly's and Orlando's parental rights under section 366.26 are conditionally affirmed.  The juvenile court is directed to ensure the Department complies fully with the inquiry and, if necessary, notice provisions of ICWA and related California law, including asking the maternal aunt about the children's possible Indian ancestry.

SEGAL, Acting P. J.

We concur:

FEUER, J.

MARTINEZ, J.